|  |  |
|---|---|
| CORAMED USA, LLC, d/b/a CORAMED SOLUTIONS, a Delaware Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> ALEXION PHARMACEUTICALS, INC., <br><br> Defendant. | Case No. _____ <br><br><br> **COMPLAINT WITH** <br> <u>JURY DEMAND</u> |

Plaintiff CoraMed USA, LLC d/b/a CoraMed Solutions ("CoraMed"), by and through its attorneys, Beattie Padovano, LLC, as and for its Complaint against Alexion Pharmaceuticals, Inc. ("Alexion"), respectfully alleges as follows:[1]

## SUMMARY

1.  CoraMed brings this action against Alexion to recover damages caused by Alexion's breach of contract and tortious interference with contracts. Alternatively, CoraMed brings this action against Alexion to recover damages caused by Alexion's breach of the implied covenant of good faith and fair dealing, for *quantum meruit*, for unjust enrichment and/or for Alexion's tortious interference with prospective economic advantages.

---

[1] This Complaint with Jury Demand ("Complaint") and the Exhibits hereto are being filed in redacted form because public disclosure of certain of the information set forth herein may violate a certain June 4, 2019 Mutual Non-disclosure Agreement ("NDA") between CoraMed and Alexion. A copy of the NDA is attached as **Exhibit 1**. Contemporaneously with the filing of this Complaint, CoraMed is bringing a motion to file the unredacted Complaint and Exhibits under seal.

2.     Alexion is a pharmaceutical company that produces the only therapies for Complement Cascade Disorders ("Complement Cascade Disorders")[2] that have been approved by the United States Food and Drug Administration, (the "FDA"), which therapies include Soliris.  Certain of Alexion's competitors sought to acquire Alexion's drugs for use in clinical trials for new therapies for Complement Cascade Disorders.  In the industry, this use is known as "comparator" use ("Comparator Use").  CoraMed provides third-party management of sales for Comparator Use ("Comparator Sales") for pharmaceutical companies.

3.     Soliris has been called the world's most expensive drug.  The annual cost to treat a single patient exceeds $450,000.  On information and belief, according to data published in Alexion's annual financial statements, this lucrative business nets Alexion approximately $300,000,000 in monthly profits.

4.     Many of Alexion's patents have lapsed.  But, on information and belief, Alexion has been able to retain complete market dominance over therapies for Complement Cascade Disorders because, among other reasons, it has refused to sell its product for Comparator Uses, a necessary precondition for competitors to obtain FDA approval for competing therapies and, thus, a requirement for entry into this lucrative market.

5.     On information and belief, ██████████████████████████████ ██████████████████████████████.  In 2019, facing increasing pressure to sell its products for Comparator Use and lacking the capacity to manage this process, Alexion sought a third-party manager of Comparator Sales.

---

[2] The "complement cascade" is a part of the immune system that enhances (i.e., complements) the ability of antibodies and phagocytic cells to clear microbes and damaged cells from an organism, promote inflammation, and attack the pathogen's cell membrane.

6.      Alexion published a Request for Proposal—Management of Alexion Commercial Product Sourcing Request for 3rd Party Clinical Use ("RFP") and, on information and belief, after receiving various competitive bids, Alexion awarded CoraMed the contract to manage Comparator Sales.

7.      As a result, CoraMed and Alexion agreed to the following terms under which CoraMed would manage Alexion's Comparator Sales (the "Agreement"):

   a.  CoraMed would manage Alexion's Comparator Use sales.

   b.  In exchange, CoraMed was designated the exclusive source through which Alexion's products would be sold for Comparator Use.

   c.  CoraMed's services would be provided at no cost to Alexion.

   d.  CoraMed would earn its fee by ███████████████████████ ████████████████████████████████ , which is in accordance with the industry standards.

8.      CoraMed performed all its obligations to be performed under the Agreement.

9.      However, suddenly, without prior notification and immediately before delivery of Alexion's products to certain purchasers, which delivery was a direct result of the services provided by CoraMed under the Agreement, Alexion failed and refused to perform its obligations under the Agreement, refused to honor the exclusivity provision of the Agreement and, instead, sold certain products directly to certain purchasers, after CoraMed had performed all of its obligations under the Agreement, and Alexion did thereby breach its Agreement with CoraMed.

10.     On information and belief, Alexion received ███████████ in revenue due to the transactions that occurred as a result of the services provided by CoraMed under the Agreement, and on account of which Alexion failed and refused to perform its obligation under the Agreement.

3

11.    As a result, under the markup agreed to between CoraMed and the purchasers, CoraMed earned, and is entitled to, $31,789,158.00 on account of those receipts.

12.    As a result of the above, it can be inferred and, on information and belief it is alleged, that Alexion never intended, *ab initio*, to fulfill its obligations under the Agreement to CoraMed.

13.    To the contrary, Alexion through deception and chicanery, and in order to avoid ████████████████, deceived CoraMed into using its expertise and know-how to manage the Comparator Sales of Soliris, never intending to perform Alexion's duties under the Agreement after the risk of the impending lawsuit was avoided.

14.    As a result, as soon as the threat of the lawsuit by others against Alexion ceased to be a risk, Alexion abandoned its obligation to CoraMed, which conduct demonstrates and manifests bad faith and willful malice.

## THE PARTIES

15.    Plaintiff CoraMed is a limited liability company organized under the laws of the State of Delaware and having its headquarters in the Borough of Brooklyn, City of New York.

16.    The members of Plaintiff CoraMed are citizens of the States of New York, Connecticut, Georgia, and California, as well as the Commonwealth of Virginia.

17.    Plaintiff CoraMed is in the business of managing the Comparator Sales of pharmaceutical companies.

18.    Defendant Alexion is a Delaware corporation with its principal executive office located in the Commonwealth of Massachusetts.

19.    Defendant Alexion is in the pharmaceutical business and, on information and belief, sells its products for Comparator Use.

## JURISDICTION, VENUE AND JURY DEMAND

20.     This Court has subject-matter jurisdiction over this matter based on diversity of citizenship in that Plaintiff CoraMed is a citizen of New York, Connecticut, Georgia, California, and Virginia, whereas Defendant Alexion is a citizen of Delaware and Massachusetts, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.     As result, this Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332(a).

22.     Venue is properly laid before this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the causes of action set forth herein occurred within the Eastern District of New York.

23.     Plaintiff demands a jury trial pursuant to FRCP 38 as to all issues so triable.

## FACTS COMMON TO ALL COUNTS

### A.     *Alexion*

24.     Defendant Alexion is an international pharmaceutical company that concentrates on therapies for rare disorders, specifically, Complement Cascade Disorders.

25.     On information and belief, Alexion concentrates on rare disorders because the approval process before the FDA, the governmental agency that regulates and approves medications and therapies for medical disorders, is swifter than for other, more common, disorders and because there are fewer competitors in the field.

26.     On information and belief, Alexion is the producer and patent owner for the only FDA-approved therapies for Complement Cascade Disorders.

27.     Alexion's leading drug by sales is eculizumab, sold under the brand name Soliris.

28.     Another of Alexion's drugs is ravulizumab, sold under the brand name Ultomiris.

29.     Soliris first received FDA approval on March 19, 2007 to treat Paroxysmal Nocturnal Hemoglobinuria ("PNH"), a rare blood disease in which a patient's immune system attacks her red blood cells.

30.     The FDA approved Ultomiris as a treatment for PNH on December 21, 2018.

31.     Soliris and Ultomiris are and have always been the only FDA approved therapies for PNH.

32.     Soliris next received FDA approval on September 23, 2011, which approval was granted for the treatment of all patients suffering from Atypical Hemolytic Uremic Syndrome ("aHUS"), a rare blood disorder that causes blood clots within a patient's kidneys.

33.     The FDA approved Ultomiris as a treatment for aHUS on October 18, 2019.

34.     Soliris and Ultomiris are and have always been the only FDA approved therapies for aHUS.

35.     Soliris next received FDA approval on October 23, 2017, which approval was granted for the treatment of patients suffering from Generalized Myasthenia Gravis ("gMG"), a rare autoimmune condition that causes muscle weakness.  Since the FDA's 2017 approval, Soliris remains the only FDA approved therapy for gMG.

36.     For this, and other reasons, one or both of these drugs are known as a comparator drug ("Comparator Drug"), which are used as an investigational product for clinical trials to measure or test the efficacy of a new drug proposed by other companies in order for the new drug to obtain FDA approval for sale to the public.

37.     As a result of the above, Alexion has reported $4.99 billion in net product sales for the calendar year 2019, $3.95 billion of which is attributable to sales of Soliris.

## B. Comparator Sales

38.     In the pharmaceutical industry, Comparator Sales, generally, involves the sale of a drug by one pharmaceutical company to other pharmaceutical companies, typically through one or more intermediaries, where the drug will be used in a clinical trial.

39.     Other pharmaceutical companies seeking to develop new therapies for Complement Cascade Disorders must run clinical trials ("Clinical Trials") in which the trial therapy is compared to the Comparator Drug—i.e., Soliris.

40.     In order to obtain FDA approval for novel therapies, sponsors ("Sponsors") of these Clinical Trials must, therefore, acquire and use Soliris.

41.     Sales of drugs for Comparator Use by Sponsors in Clinical Trials is part of the distribution process, also known as the Comparator Sales Channel.

42.     Comparator Sales distributions as part of the Comparator Sales Channel require specialized management in order to account for certain unique concerns, including but not limited to, the following:

a.     During Clinical trials, at times, certain significant adverse event ("Significant Adverse Events"), may occur, which must be documented and reported to the FDA and, thus, a structure must be established and employed by the manufacturer of the Comparator Drug to assure the legitimacy of any such Significant Adverse Events alleged by the Sponsors and to assure the integrity thereof.

b.     A system and structure is required to screen against rogue purchasers who often attempt to acquire drugs under ruse that they will be used for Clinical Trials only to resell them into the lucrative therapeutic market without the required storage

and transportation guidelines, which jeopardizes the efficacy of the therapy and put patient lives at risk.

c. Without a proper and effective monitoring structure or system, Comparator Sales can result in the Comparator Drug being used for non-approved purposes or for the wrong populations, which in turn can lead to, among other things, increased Significant Adverse Events, which could lead to, among other things, the FDA imposing additional label warnings. In fact, competitor pharmaceutical companies often design Clinical Trials in a manner that will increase the likelihood of Significant Adverse Events in order to impact

43. Because of these, and other characteristics of Comparator Uses, CoraMed provides services for the Comparator Sales distribution, or Comparator Sales Channel, for pharmaceutical companies.

44. On information and belief, Alexion has avoided selling its products for Comparator Use in a presumptive attempt to maintain its market dominance with respect to therapies for Complement Cascade Disorders.

45. On information and belief, due to Soliris's high cost and its restricted distribution, competitors of Alexion had been unable to obtain Soliris for Comparator Use for Clinical Trials.

46. On information and belief, a competitor of Alexion had alleged that ████████ ████████████████████████████████████████████████████████████ ██████.

47. On information and belief, in or around February 2018, Alexion learned that at least one competitor, █████, was actively seeking to acquire Soliris for Comparator Use in a Clinical Trial to develop a novel therapy for Complement Cascade Disorders.

48.     On information and belief, based on the demand from ▮▮▮▮ coupled with an

understanding that the refusal to sell Soliris to ▮▮▮▮ for Comparator Use may give rise to civil

or other liability under existing or proposed legislation, Alexion began to investigate selling

Soliris for Comparator Use.

49.     On information and belief, Alexion considered managing its Comparator Sales

Channel internally, but ultimately determined that it lacked the experience and know-how

necessary to do so.

50.     As a result, Alexion issued the RFP.

### C.     The Agreement and CoraMed's Performance

51.     On July 12, 2019, Alexion published the RFP.  A true copy of the RFP is attached

hereto as **Exhibit 2**.  The RFP stated that it sought:

> a strategic third partner to act as an intermediate third party who will
> 1) evaluate the suitability of sponsors seeking to source Alexion
> commercial product for clinical trial use, 2) if determined suitable,
> on-board sponsors in order to process and provide sponsor with
> Alexion commercial product for clinical use, 3) assure that sponsors
> seeking to source Alexion commercial product for clinical use meet
> the safety and reporting requirements for each Alexion product, 4)
> aggregate the total demand from potential sponsors of Alexion
> commercial product for clinical trial use, and 5) assist with
> brokering transactions between a sponsor and Alexion to purchase
> Alexion commercial product for clinical trial use.

**Exhibit 2**, RFP at Section 2.1.

52.     With respect to the compensation structure, the RFP stated as follows:

> It is Alexion's expectation that the services associated with this RFP



**Exhibit 2**, RFP at Section 2.5.

53. During a July 18, 2019 conference call between CoraMed and Alexion, Alexion confirmed that it would sell Soliris to CoraMed ██████████████████████████ ████████████████████, and that CoraMed would, in turn, resell Soliris through the Comparator Sales Channel, ██████████████████████████████████████████ ████████ as is the standard industry practice.

54. As a result, CoraMed responded to the RFP on July 29, 2019, which included CoraMed's Bid Response Executive Summary. A true copy of CoraMed's Bid Response Executive Summary is attached hereto as **Exhibit 3.**

55. Under its bid proposal, CoraMed would capture revenue ████████████████ ████████████████████████████████████████████████████████████████ ████████████████. **Exhibit 3**, Bid Response Executive Summary at 4. This arrangement is standard within the industry.

56. On August 15, 2019, Alexion's procurement team, including ████████, and CoraMed's President held another telephone conference during which ████████ confirmed that Alexion would sell Soliris to CoraMed ████████ and that CoraMed would resell Soliris ████ ██████████████████████████████████████████████.

57. Following the August 15, 2019 telephone call and at all times thereafter, it was agreed that Alexion would sell Soliris to CoraMed ████████ and that CoraMed would resell Soliris ██████████████████████████████████████████.

58. On August 16, 2019, Alexion advised that CoraMed had been awarded the project.

59. On or around August 20, 2019, Alexion advised CoraMed that CoraMed should start work immediately because on August 6, ████████ had threatened Alexion with a lawsuit for its

10

past and continuing practice of refusing to sell its products for comparator use. Per Alexion's demand, CoraMed immediately began work.

60. On August 23, 2019, Alexion provided CoraMed with eighteen months' worth of backlogged purchase demands and put CoraMed in touch with prospective purchasers.

61. From August 23 through September 13, CoraMed screen approximately ██ requests to purchase Solaris for clinical studies.

62. From August 23 through December 2020, Alexion repeatedly advised potential purchasers that CoraMed was the exclusive manager of Comparator Sales for Soliris.

63. On September 5, 2019, Alexion's representative and CoraMed's President held a telephone conference during which Alexion reconfirmed that Alexion would sell Soliris to CoraMed ██████ and that CoraMed would resell Soliris ████████████████████████ ████████████████████████.

64. On or around September 13, 2019, CoraMed presented its first round of order requests for the comparator use of Soliris to Alexion for Alexion's internal consideration, suggesting that ██ purchase requests be considered for approval.

65. On September 13, 2019, Alexion's internal committee approved the sale of Soliris to be used for comparator purposes in ████ clinical trial, which were to be sponsored by ██████ ██████ and ██████

66. ████ ████ and ██████ were all represented by their purchasing agent ████████████████ ("████"), which had agreed to pay ████████ of Soliris both prior to and after September 13, 2019.

67.     Of the ███ purchase demands that CoraMed had reviewed and screened, the ███ approved sales through ███ to ███ ███ and ███ were the only transactions through which CoraMed would have been able to realize revenue.

68.     On September 24, 2019, Alexion confirmed to CoraMed that purchases for ███ ███ and ███ for the approved Clinical Trials would proceed on the previously agreed upon pricing.

69.     Following the September 13, 2019 approval by Alexion, CoraMed continued to manage these transactions and provided valuable services to Alexion.

70.     Between September 13 through January 2020, CoraMed continued to provide services to Alexion, including screening additional requests to purchase Alexion's drugs for Comparator Use, providing grey market product security risk analyses, and analyzing the impact of proposed legislation on Alexion's business and Comparator Sales.

### D.     *Alexion's Breach and its Bad-faith Pretext for Terminating CoraMed*

71.     From August 16 through January 14, 2020, CoraMed performed under the Agreement, implementing and managing Alexion's Comparator Sales Channel.  During that time, CoraMed continued to screen requests to purchases Soliris for Comparator Use.

72.     Alexion continued to advise ███ ███ ███ and ███ that CoraMed was the sole broker and point of contact for purchasing Soliris for Comparator Sales.

73.     Unbeknownst to CoraMed, in or around November and/or December of 2019, Alexion began dealing directly with ███ and/or ███ ███ and ███

74.     Upon information and belief, and unbeknownst to CoraMed at the time, in December 2019, Alexion delivered to ███ and/or ███ ███ and ███ the first orders of Soliris for Comparator Use.

12

75.     Upon information and belief, and unbeknownst to CoraMed at the time, in December 2019, Alexion collected payment directly for the delivered Soliris from ███ and/or ███ ███ and ███ the first orders of Soliris for Comparator Use.

76.     On January 14, 2020, without warning or prior notification, Alexion advised CoraMed that it was terminating its Agreement with CoraMed and that CoraMed should stop all work under the Agreement.

77.     On information and belief, Alexion terminated CoraMed because Alexion wished to maintain its monopoly position with respect to therapies for Complement Cascade Disorders.

78.     On information and belief, Alexion terminated the Agreement with CoraMed at because of the December 2019 sales to ███ and/or ███ ███ and ███ which eliminated the then-impending risk of the lawsuit threatened by ███

79.     On information and belief, Alexion intended to delay the fulfillment of future requests to purchase Soliris for Comparator Use by terminating the CoraMed Agreement.

80.     However, on or about January 8, 2020, Alexion, as a pretext, claimed that it was terminating CoraMed because an Alexion employee held an ownership interest in CoraMed, even though that employee's ownership interest in CoraMed was disclosed to at least three senior Alexion employees, including Alexion's Executive Vice President, Chief Legal Officer and Corporate Secretary and Vice President/Head of Global Supply Chain, all of whom confirmed that they were aware of the employee's ownership interest in CoraMed, which was confirmed in writing, and which involvement they had approved.

81.     Alexion invited CoraMed to submit a bid proposal and Alexion awarded CoraMed management of Alexion's Comparator Sales Channel knowing that the Alexion employee held an ownership interest in CoraMed.

82.     The Alexion employee was walled off from the RFP process, which resulted in CoraMed winning the bid.

83.     As a result, there were no circumstances that would form the basis of a conflict between CoraMed and Alexion.

### E.     *Grounds for Damages*

84.     Alexion has failed and refused to pay CoraMed what it is owed under the Agreement on account of services that CoraMed rendered to Alexion.

85.     On information and belief, for the services rendered by CoraMed to Alexion under Agreement, Alexion, received sales in the amount of ██████████.

86.     CoraMed and Alexion agreed to and did provide its services to Alexion in exchange for ████████████████████████.

87.     On information and belief, Alexion benefitted financially from CoraMed's services that CoraMed provided under the Agreement.

88.     The work performed by CoraMed between August 16, 2019 and September 13, 2019 also resulted in the elimination of the then-impending and threatened lawsuit by ████

89.     Because of the urgency arising out of the threatened ████ lawsuit and Alexion's insistence that CoraMed immediately perform services under the Agreement, and screen eighteen months' worth of backlogged purchase orders, CoraMed forewent other business opportunities, including opportunities provide its services to other pharmaceutical companies.

**COUNT I – Breach of Contract**

90.     CoraMed hereby incorporates paragraphs 1 through 89, above, as if fully set forth herein.

91.     The Agreement is a valid and fully enforceable contract between CoraMed and Alexion.

92.     CoraMed, pursuant to the Agreement with Alexion, fully performed under the Agreement by providing services in connection with the comparator sales channel for Alexion's products.

93.     Alexion breached its covenants under the Agreement by circumventing CoraMed and dealing directly with purchasers and/or sponsors with respect to comparator sales.

94.     Alexion further breached its covenants under the Agreement by interfering with CoraMed's ability to collect a markup on comparator sales for which it provided services.

95.     CoraMed has been damaged because of Alexion's breach

96.     CoraMed has been damaged in an amount in excess of $31,789,158.

**COUNT II – Breach of the Implied Covenant of Good Faith and Fair Dealing**

97.     CoraMed hereby incorporates paragraphs 1 through 96, above, as if fully set forth herein.

98.     The Agreement between Alexion and CoraMed, like all Agreements in New York, includes an implied covenant of good faith and fair dealing.

99.     Under the implied covenant of good faith and fair dealing, Alexion implicitly covenanted that it would not undertake any act or omission that would have the effect of destroying or injuring the right of CoraMed to receive the fruits of the Agreement.

100.     Alexion breached the implied covenant of good faith and fair dealing when, through its acts and omissions, Alexion surreptitiously cut CoraMed out of the deal and dealt directly with the purchasers and/or sponsors.

101.     Alexion's acts and omissions destroyed CoraMed's ability to receive the fruits of the Agreement with respect to the consummated comparator sales.

102.     Alexion's acts and omissions have destroyed CoraMed's ability to earn fees in connection with future comparator sales of Alexion products.

103.     Alexion's acts and omissions have damaged CoraMed's standing in the marketplace, thereby injuring its business generally.

104.     CoraMed has been damaged in an amount to be determined at the time of trial.

### COUNT III – Unjust Enrichment (pled in the alternative)

105.     CoraMed hereby incorporates paragraphs 1 through 104, above, as if fully set forth herein.

106.     Alexion received valuable services from CoraMed as set forth herein.

107.     Alexion realized various financial benefits as a result of the valuable services provided by CoraMed.

108.     CoraMed is entitled to compensation for the valuable services delivered to and retained by Alexion based on the financial benefits realized by Alexion from CoraMed's valuable services.

109.     Alexion has refused to compensate CoraMed based on the financial benefits realized by Alexion from CoraMed's valuable services.

110.     As such, Alexion has been enriched at CoraMed's expense.

111.     Alexion's retention of the financial benefits of the valuable services provided by CoraMed without payment to CoraMed is unjust.

112.     CoraMed has been damaged by Alexion's refusal to compensate based on the financial benefits realized by Alexion from the valuable services delivered by CoraMed in an amount to be determined at the time of trial.

### COUNT IV - *Quantum Meruit* (pled in the alternative)

113.     CoraMed hereby incorporates paragraphs 1 through 112, above, as if fully set forth herein.

114.     At Alexion's request and direction, CoraMed, in good faith, performed valuable services in connection with Alexion's comparator sales channel.

115.     Alexion readily accepted those services from CoraMed.

116.     CoraMed reasonable expected to receive compensation for the services rendered.

117.     CoraMed did not receive compensation for the services rendered.

118.     CoraMed is entitled to collect the reasonable value of the services delivered to and retained by Alexion.

119.     Despite demand, Alexion has refused to compensate CoraMed for the reasonable value of the services rendered.

120.     CoraMed has been damaged by not having received the reasonable value of its services in an amount to be determined at the time of trial.

### COUNT V – Tortious Interference with Contracts

121.     CoraMed hereby incorporates paragraphs 1 through 120, above, as if fully set forth herein.

122.     CoraMed had contracts with numerous third parties, including ███ as the representative of ███ ███ and ███ the sponsors of three clinical trials, in connection with the acquisition of Alexion products for comparator use.

123.     At all relevant times, Alexion was aware of and had knowledge of the contracts between CoraMed's and ███ ███ ███ and/or ███ including the intended sale of Alexion products on for comparator use and the terms thereof.

124.     Alexion intentionally induced ███ ███ ███ and/or ███ to breach their respective agreements with CoraMed.

125.     ███ ███ ███ and/or ███ in fact, did not perform under their agreements with CoraMed, instead purchasing Soliris from Alexion directly.

126.     Had it not been for Alexion's interference, ███ ███ ███ and/or ███ would not have breached their Agreements to transact with CoraMed.

127.     Alexion's interference with the contracts between CoraMed's ███ ███ ███ and/or ███ was actual and prospective relations were willful, wanton, malicious, intentional and deliberate.

128.     Alexion's malicious and unlawful conduct has had a devasting impact on CoraMed's present and future business prospects.

129.     Alexion's conduct, as set forth herein, has a character of outrage frequently associated with crime.

130.     Indeed, as a result of Alexion's malicious and unlawful conduct, CoraMed lost profits, was forced to seek emergency financing, and sustained other injuries.

131.     CoraMed has been damaged in an amount to be proven at trial.

## COUNT VI – Tortious Interference with a Prospective Economic Advantage
### (pled in the alternative)

132.    CoraMed hereby incorporates paragraphs 1 through 131, above, as if fully set forth herein.

133.    CoraMed had actual and prospective business relationships with numerous third parties, including ████ as the representative of ████ ████ and ████ the sponsors of three clinical trials, in connection with the acquisition of Alexion products for comparator use.

134.    At all relevant times, Alexion was aware of CoraMed's actual and prospective business relationships with ████ ████ ████ and ████ including the intended sale of Alexion products on for comparator use and the terms thereof.

135.    Alexion intentionally interfered with the prospective business relationships between CoraMed on the one hand, and ████ ████ ████ and ████ on the other as set forth herein.

136.    Alexion, unlawfully and outside the scope of any conceivable legitimate interest, role or function, among other things, breached duties owed to CoraMed, committed *prima facie* tort, and, on information and belief, defamed CoraMed to ████ ████ ████ and/or ████ for the purpose of harming CoraMed's business relationships with ████ ████ ████ and/or ████

137.    In interfering with the prospective transaction between CoraMed and ████ ████ ████ and/or ████ Alexion acted for the sole purpose of harming CoraMed.

138.    Alexion committed these acts and omissions without any valid legal basis.

139.    Had it not been for Alexion's interference, CoraMed would have transacted with ████ ████ ████ and/or ████

19

140. Alexion's acts of interference with CoraMed's actual and prospective relations were willful, wanton, malicious, intentional and deliberate.

141. Alexion's malicious and unlawful conduct has had a devasting impact on CoraMed's present and future business prospects.

142. Alexion's conduct, as set forth herein, has a character of outrage frequently associated with crime.

143. Indeed, as a result of Alexion's malicious and unlawful conduct, CoraMed lost profits, was forced to seek emergency financing, and sustained other injuries.

144. CoraMed has been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, CoraMed respectfully requests that the Court enter judgment in its favor and against Alexion, and award the following relief:

a. As and for Count I, compensatory and actual damages in an amount of $31,789,158;

b. As and for Counts II through VI, compensatory and actual damages in an amount to be determined at the time of trial;

c. As and for Counts V and VI, punitive damages in an amount to be determined at the time of trial;

d. As and for all Counts, pre-judgment and post-judgment interest under Article 50 of the New York CPLR; and

e. Any and all other legal and equitable remedies that this Court deems equitable, just and proper.

Dated: Larchmont, NY  
      May 5, 2020

Respectfully submitted,  
BEATTIE PADOVANO, LLC

By: */s/ Martin R. Kafafian*   .  
Martin R. Kafafian  
Arthur N. Chagaris (*pro hac vice* admission pending)  
99 Main Street, Suite 319  
Nyack, New York 10960  
    and  
50 Chestnut Ridge Road, Suite 208  
Montvale, New Jersey 07645  
Tel: 201-799-2102  
Email: mrk@beattielaw.com

## CERTIFICATION IN ACCORDANCE WITH 28 U.S.C. § 1746

I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: Larchmont, NY
        May 5, 2020

Respectfully submitted,
BEATTIE PADOVANO, LLC

By: */s/ Martin R. Kafafian*          .
Martin R. Kafafian
Arthur N. Chagaris (*pro hac vice* admission pending)
99 Main Street, Suite 319
Nyack, New York 10960
     and
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645
Tel: 201-799-2102
Email: mrk@beattielaw.com

## JURY DEMAND

CoraMed USA, LLC, demands a trial by jury of all issues so triable pursuant to Rule 38

of the Federal Rules of Civil Procedure.


Dated: Larchmont, NY
      May 5, 2020

Respectfully submitted,

BEATTIE PADOVANO, LLC

By: */s/ Martin R. Kafafian*        .
Martin R. Kafafian
Arthur N. Chagaris (*pro hac vice* admission pending)
99 Main Street, Suite 319
Nyack, New York 10960
    and
50 Chestnut Ridge Road, Suite 208
Montvale, New Jersey 07645
Tel: 201-799-2102
Email: mrk@beattielaw.com