UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
CORAMED USA, LLC, d/b/a CORAMED SOLUTIONS,

                                    Plaintiff,

                                                            **MEMORANDUM &**
                                                            **ORDER**
                    -against-                               20-CV-2052-SJB

ALEXION PHARMACEUTICALS, INC.,

                                    Defendant.
----------------------------------------------------------------X
**BULSARA, United States Magistrate Judge:**

        Alexion Pharmaceuticals, Inc. ("Alexion") is a global pharmaceutical company

that manufactures Soliris, the sole drug approved by the U.S. Food and Drug

Administration to treat life-threatening "complement cascade" disorders.  This action

arises from an alleged agreement between Alexion and CoraMed USA, LLC

("CoraMed"), under which CoraMed would exclusively sell Soliris to Alexion's

competitors for use in clinical trials for novel therapies.  CoraMed alleges that it entered

into and performed its agreement with Alexion, which failed to honor its side of the

purported contract.  CoraMed asserts a variety of state law claims, four of which Alexion

now seeks to dismiss—breach of contract, breach of the implied covenant of good faith

and fair dealing, tortious interference with contract, and tortious interference with

prospective economic advantage.  (Mot. to Dismiss dated Oct. 14, 2020, Dkt. No. 27).

For the reasons described below, the motion is granted in part and denied in part.

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

        For the purposes of this motion, the Court is "required to treat" the Complaint's

"factual allegations as true, drawing all reasonable inferences in favor of [CoraMed] to

the extent that the inferences are plausibly supported by allegations of fact."  *In re Hain*

*Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 133 (2d Cir. 2021).  The Court "therefore recite[s] the substance of the allegations as if they represented true facts, with the understanding that these are not findings of the court, as we have no way of knowing at this stage what are the true facts."  *Id.*

Alexion is an international pharmaceutical company that produces drug therapies used to treat rare autoimmune and blood diseases termed "Complement Cascade Disorders."  (Compl. dated May 5, 2020 ("Compl."), Dkt. No. 1 ¶¶ 2, 24).  Its leading drugs by sales are eculizumab, sold under the brand name Soliris, and ravulizumab, sold under the brand name Ultomiris.  (*Id.* ¶¶ 27–28).  These two drugs are the only therapies approved by the U.S. Food and Drug Administration ("FDA") to treat Paroxysmal Nocturnal Hemoglobinuria, Atypical Hemolytic Uremic Syndrome, and Generalized Myasthenia Gravis.  (*Id.* ¶¶ 29–35).  Alexion is the producer and patent owner for the only FDA-approved therapies for Complement Cascade Disorders.  (*Id.* ¶ 26).  Alexion reported $4.99 billion in net product sales for 2019, $3.95 billion of which is attributable to sales of Soliris.  (*Id.* ¶ 37).

Some of Alexion's competitors have sought to acquire these drugs for use in clinical trials for new therapies, as an investigational product to measure or test the efficiency of a proposed new or alternative drug.  (*Id.* ¶¶ 2, 36).  This process—"Comparator Use"—is a necessary precondition for other pharmaceutical companies to obtain FDA approval for their potential competing therapies.  (Compl. ¶¶ 4, 36).  Facing increasing demand and pressure to sell its drugs for Comparator Use, Alexion published a "Request for Proposal" ("RFP") on July 12, 2019, seeking a partner to manage the sale of Soliris to sponsors of clinical trials—in effect, to act as an intermediary third party in

the distribution process.[1]  (*Id.* ¶ 51).  The third party's role was to evaluate the suitability of sponsors seeking to source Soliris for clinical trial use and then assist with brokering such sale transactions.  (*Id.*).

CoraMed provides third-party management of sales for Comparator Use for pharmaceutical companies.  (*Id.* ¶ 2).  During a July 18, 2019 conference call, Alexion confirmed CoraMed would sell Soliris for Comparator Use.  (*Id.* ¶ 53).  CoraMed subsequently responded to the RFP on July 29, 2019.  (*Id.* ¶ 54).  During another telephone conference between Alexion's procurement team and CoraMed's President on August 15, 2019, Alexion confirmed it would sell Soliris to CoraMed, and CoraMed would resell it to sponsors.  (Compl. ¶ 56).  Alexion "advised" CoraMed had been awarded the project the following day.  (*Id.* ¶ 58).

On a September 5, 2019 telephone call, Alexion's representative re-confirmed this arrangement.  (*Id.* ¶ 63).  CoraMed was designated as the "exclusive source" for distribution of Alexion's products for Comparator Use.  (*Id.* ¶ 7).  CoraMed was not paid

---

[1] Alexion sought

a strategic third partner to act as an intermediate third party who will 1) evaluate the suitability of sponsors seeking to source Alexion commercial product for clinical trial use, 2) if determined suitable, on-board sponsors in order to process and provide sponsor with Alexion commercial product for clinical use, 3) assure that sponsors seeking to source Alexion commercial product for clinical use meet the safety and reporting requirements for each Alexion product, 4) aggregate the total demand from potential sponsors of Alexion commercial product for clinical trial use, and 5) assist with brokering transactions between a sponsor and Alexion to purchase Alexion commercial product for clinical trial use.

(Compl. ¶ 51; Request for Proposal (RFP)—Management of Alexion Commercial Product Sourcing Request for 3rd Party Clinical Use dated July 12, 2019 ("RFP"), attached as Ex. 2 to Compl., § 2.1).

directly by Alexion; it was to earn its fee through a markup paid by purchasers.  (*Id.* ¶¶ 7, 11).

On August 20, 2019, Alexion advised CoraMed that it should start work immediately.  (*Id.* ¶ 59).  Three days later, Alexion provided CoraMed with 18 months' worth of backorders and put CoraMed in touch with prospective purchasers.  (Compl. ¶ 60).  On September 13, 2019, CoraMed presented its first round of order requests for Alexion's internal consideration, and Alexion subsequently approved the sale to three sponsors.  (*Id.* ¶¶ 64–65).

From August 2019 through January 2020, CoraMed managed Alexion's Comparator Sales and continued to screen requests to purchase Soliris for Comparator Use.  (*Id.* ¶ 71).  It also provided "grey market product security risk analyses" and analyzed the impact of proposed legislation on Alexion's business.  (*Id.* ¶ 70).  And Alexion "repeatedly" advised potential purchasers that CoraMed was the exclusive manager of Comparator Sales for Soliris.  (*Id.* ¶ 62).

Unbeknownst to CoraMed, Alexion began dealing directly with purchasers in November or December 2019, collecting payment for the first orders of Soliris for Comparator Use.  (*Id.* ¶¶ 73, 75).  Without prior warning or notification, Alexion terminated the parties' arrangement on January 14, 2020.  (Compl. ¶ 76).  Alexion claimed the reason for the termination was that an Alexion employee held an ownership interest in CoraMed.  (*Id.* ¶ 80).  But that employee's ownership interest was, in fact, disclosed to three of Alexion's senior officers—before CoraMed even submitted its initial bid proposal—all of whom confirmed in writing their knowledge of the employee's ownership interest.  (*Id.* ¶¶ 80–81).  The employee was walled off from the RFP process. (*Id.* ¶ 82).  Alexion failed to pay CoraMed for the services it rendered.  (*Id.* ¶ 84).

CoraMed sets forth six claims in the Complaint: (1) breach of contract (Count I); (2) breach of the implied covenant of good faith and fair dealing (Count II); (3) unjust enrichment (Count III); (4) quantum meruit (Count IV); (5) tortious interference with contract (Count V); and (6) tortious interference with prospective economic advantage (Count VI).[2]  (*Id.* ¶¶ 90–144).  Alexion moved to dismiss Counts I, II, V, and VI.

DISCUSSION

"The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of . . . claims for relief."  *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018) (citing *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).  In deciding such a motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (quotations and alteration omitted); *Amadei*, 348 F. Supp. 3d at 155 ("[W]hen reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of [the non-moving party].").

Once the facts are construed in the light most favorable to the non-moving party—here, CoraMed—to avoid dismissal, there must be sufficient facts that allege a plausible claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quotations

---

[2] The claims for unjust enrichment, quantum meruit, and tortious interference with prospective economic advantage are each "pled in the alternative."  (*See generally* Compl. Counts III, IV, VI).

omitted)).  For the purposes of a motion to dismiss, such facts "include any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).  "[L]imited quotation does not constitute incorporation by reference." *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985).  Even "[w]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).  "A 'necessary prerequisite' for taking into account materials extraneous to the complaint 'is that the plaintiff *rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough.'" *Id.* at 231 (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  A complaint must contain more than "naked assertion[s] devoid of further factual enhancement." *Id.* (quotations omitted).  In other words, a plausible claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; Fed. R. Civ. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007) (citation omitted).  The determination of whether a party has alleged a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see*

6

*also Escamilla v. Young Shing Trading Co.*, No. 17-CV-652, 2018 WL 1521858, at *2 (E.D.N.Y. Jan. 8, 2018), *report and recommendation adopted*, 2018 WL 1033249, at *3 (Feb. 23, 2018).

I.   Breach of Contract

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)); *accord Canzona v. Atanasio*, 118 A.D.3d 837, 838 (2d Dep't 2014).  As to the first element, "[i]n determining whether the parties intended to enter a contract, and the nature of the contract's material terms, [courts] look to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Stonehill Cap. Mgmt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 448–49 (2016) (quotations omitted); *see also Allegrino v. Ruskin Moscou Faltischek, P.C.*, No. 21-484, 2021 WL 5500084, at *1 (2d Cir. Nov. 24, 2021) (following *Stonehill*). "Disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Stonehill Cap. Mgmt.*, 28 N.Y.3d at 449 (quotations and alteration omitted).

CoraMed asserts the parties entered into an enforceable contract through a series of oral communications and telephone calls—including those on July 18, August 15, and September 5—wherein Alexion agreed to sell Soliris to CoraMed, and CoraMed, in turn, agreed to resell Soliris to sponsors for clinical use.  (Compl. ¶¶ 53, 56–58, 63).  CoraMed alleges that Alexion breached that contract by dealing directly with (and collecting

payment from) three sponsors with whom CoraMed had already brokered sales of Soliris for Comparator Use.  (*Id.* ¶¶ 64–68, 73–75, 93–94).  Alexion seeks to dismiss the breach of contract claim on the grounds that there was no signed, written agreement.

Alexion argues a binding contract never existed between the parties, because the parties intended to be bound only in a signed writing, and it is undisputed that no written contract was executed.  (Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Def. Mem."), Dkt. No. 28 at 7).  "[W]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent." *Stonehill Cap. Mgmt.*, 28 N.Y.3d at 451 (quoting *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984)).  Alexion points to specific language in the RFP, which it says "clearly establish[es]" the intent not to be bound in the absence of a signed writing: "This RFP is not a contract offer. . . .  If your firm doesn't have an existing MSA with Alexion, please provide your MSA document for our legal review."  (RFP § 1.4; *see also id.* ("RFP is not a Contract")).[3]  Alexion misapprehends this provision.  This provision only states that the RFP itself does not amount to a contract.  But the fact that the RFP (or acceptance of the RFP's terms) is not itself a binding agreement does not foreclose the possibility that the parties entered into a contract (oral or written).  Alexion's argument is also inapposite: CoraMed does not contend the RFP constituted a contract. (*See* Compl. ¶¶ 53–58, 63).

Alexion also contends that because the RFP contemplated the drafting of an additional written document—the master service agreement—the parties only intended to be bound in writing.  The mere existence of a future written agreement does not

---

[3] The RFP was attached as an exhibit to the Complaint.

establish—particularly on a motion to dismiss—an intent to be bound *only* upon a signed writing.  *See Kolchins v. Evolution Markets, Inc.*, 128 A.D.3d 47, 60 (1st Dep't 2015) ("[T]o overcome the reasonable inference . . . that the parties did indeed intend thereby to create a binding contract[,] defendant must do more than merely point to the circumstance that a formal document was contemplated[.]"), *aff'd*, 31 N.Y.3d 100, 110 (2018); *Jordan Panel Sys. Corp. v. Turner Constr. Co.*, 45 A.D.3d 165, 169 (1st Dep't 2007) (distinguishing an intent not to be bound absent a writing from "a statement that merely refers to the expectation that a writing will be prepared to memorialize an agreement"); *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968) ("[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.").

Alexion relies heavily on a series of cases, primarily *Jordan Panel Systems Corp. v. Turner Construction Co.*, to advance its argument that absent a formal agreement, any contract claim here must be dismissed.  (Def. Mem. at 8–13).  The cases do not assist its argument and are factually inapposite.  In *Jordan Panel*, a subcontractor sued a general contractor for breach of contract.  45 A.D.3d at 166.  During the course of negotiations, the defendant—Turner Construction Company—sent a term sheet, containing the following sentence: "Unless and until Turner Construction Co. executes this Subcontract, Turner shall not be bound by any of the terms or conditions herein." *Id.* at 167 (emphasis omitted).  The New York Court of Appeals held: "[U]ndisputed documentary evidence establishes that defendant advised plaintiff—in writing, and in terms that left no room for doubt—that defendant did not intend to be contractually bound to hire plaintiff until both of these highly sophisticated parties had signed the contemplated written agreement."  *Id.* at 166.  But Alexion did not make such an express

disclaimer in the RFP.  As noted, the RFP only states that it is not a binding contract, not that Alexion would not *ever* enter into a contract with any party (let alone CoraMed) unless the agreement was written.[4]  Moreover, the pattern of conduct that CoraMed alleges—that Alexion acted as if a contract was in place—suggests that neither party believed the RFP's disclaimer to mean what Alexion now contends.  *See, e.g.*, *NAP, Inc. v. FRAJAC*, 104 F.3d 350, 1996 WL 537914, at *2 (2d Cir. 1996) (table) ("Although the letter did state that its terms would not be effective until a formal agreement was executed, this language is not strong enough to counter other indicia of an intent to be bound. . . .  Extensive performance by both parties also strongly indicated a binding commitment to the terms of the letter. . . and bespoke an understanding by the parties that they were bound."); *Giunta v. Dingman*, 893 F.3d 73, 80 n.9 (2d Cir. 2018) ("He contends that this illustrates that the parties did not intend to be bound until their agreement was reduced to writing, and thus, the Agreement was not binding.  Gordon and Dingman's subsequent conduct belies this argument." (quotations and alteration omitted)); *NYKCool A.B. v. Pac. Fruit, Inc.*, 507 F. App'x 83, 86 (2d Cir. 2013) ("[T]he parties' substantial partial performance on the contract weighs strongly in favor of contract formation.").

Alexion next references the draft master service agreement ("MSA") as evidence of its intent not to be bound, (*see* Managed Service Provider and Customer Supply Agreement ("MSA"), attached as Ex. 1-B to Decl. of J. William Madden dated Oct. 14,

---

[4] The other cases cited by Alexion are similarly inapposite.  Like *Jordan Panel*, the documents in those cases contained an express reservation not to be bound absent a subsequent writing.  *See, e.g.*, *StarVest Partners II, L.P., v. Emportal, Inc.*, 101 A.D.3d 610, 611 (1st Dep't 2012) ("[T]here is no obligation on the part of any party unless and until a definitive stock purchase agreement is signed by all parties.").

2020, Dkt. No. 33), but that argument fares no better.  To be clear, the MSA was not even Alexion's document, but a document sent by CoraMed to Alexion.  (Def. Mem. at 11 ("On July 29, 2019, Plaintiff transmitted its RFP response to Alexion, which included . . . a draft MSA.")).  But here, Alexion is relying on the MSA to demonstrate its intent not to be bound except in writing.  A document not drafted by Alexion and not signed by it, unaccompanied with any contemporaneous communication or similar evidence acknowledging Alexion's agreement to its terms, cannot evidence Alexion's intent.

Separate and apart, the provisions Alexion relies on in the MSA do not mean what it claims.

*First*, the MSA's language that "[n]either Party shall have the authority to bind the other Party unless otherwise agreed in writing by the Parties," (MSA § 11), would only bar oral agreements if the MSA had been executed.  But it was not.  The version provided by Alexion is not signed by CoraMed and even bears a "DRAFT" watermark. (*See* MSA at 12).  (Indeed, Alexion repeatedly refers to the agreement as a "draft."  (*See, e.g.*, Def. Mem. at 11–13, 15–16)).  An unexecuted contract containing a mutual agreement between parties not to bind each other absent a writing has no force or effect. *See, e.g.*, *Karlin v. Avis*, 457 F.2d 57, 62 (2d Cir. 1972) ("None of the documents relied upon by appellant was prepared or signed by Avis.  In New York unsigned writings prepared by a plaintiff, without more, do not suffice to bind a defendant."); *see also John v. Cent. Loan Admin. & Reporting*, No. 21-CV-1411, 2021 WL 1845913, at *2 (E.D.N.Y. Apr. 13, 2021).  This stands in stark contrast to the cases Alexion cites where, for example, both parties execute a term sheet which requires any future agreement be written.  (*See* Def. Mem. at 9 (citing *Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*,

23 A.D.3d 213, 213 (1st Dep't 2005) (dismissing breach of contract claim where letter agreement was conditioned on the "execution of a definitive agreement satisfactory in form and substance" to both sides))).

*Second*, the provisions in paragraph 17 of the MSA—"Complete Agreement" and "Modification and Waiver"—are parol evidence provisions in an unexecuted agreement. They only demonstrate that the MSA itself could not be altered by other agreements or writings. In an unexecuted agreement, they have no force, and again, do not demonstrate Alexion's intent.

Fatal to the MSA-based arguments is that the Court may not even consider the MSA on this motion. It was not attached to the Complaint and is not relied upon or cited to by CoraMed in its allegations.[5] *See supra* at 5–6; *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not

---

[5] Alexion relies upon a bevy of extraneous documents in its briefing. (*See, e.g.*, Def. Mem. at 22 (referencing a "draft Supply Agreement" for Soliris for "Clinical Trial Use," to be executed by Alexion and any clinical trial sponsor seeking to purchase Soliris); Reply in Supp. of Def.'s Mot. to Dismiss ("Def. Reply"), Dkt. No. 31 at 4 (referencing an "email Plaintiff's president, Jason Moreland, circulated on September 5, 2019, attaching a revised draft of the MSA in 'redline' form")). CoraMed has not relied upon such documents in the Complaint or otherwise offered them as evidence. And the arguments that these are "integral" to the Complaint, and therefore should be considered by the Court, are a stretch. Documents not referenced by the Complaint in any fashion but merely relevant to a defendant's defense to liability may not be considered by the Court on a motion to dismiss. *See, e.g.*, *Regeda v. City of New York*, No. 09-CV-5427, 2012 WL 7157703, at *3 (E.D.N.Y. Sept. 7, 2012) ("Here, the defendants do not assert, because they cannot, that the publicly filed documents attached to their moving papers were either attached to or incorporated by reference in the Complaint. The Complaint does not mention these documents at all. Thus, . . . the court . . . cannot examine these documents to assess the validity of . . . [a] defense in the absence of parallel allegations in the Complaint."), *report and recommendation adopted*, 2013 WL 619567, at *2 (Feb. 19, 2013).

enough.").  At bottom, Alexion's arguments for dismissal fail to grapple with CoraMed's theory of contract formation and breach: that Alexion's post-RFP conduct evidences the formation and performance of an agreement, which Alexion breached by not paying CoraMed for services rendered.  And at a motion to dismiss, where the Court must accept CoraMed's allegations as true, it is inappropriate to credit Alexion's view of the evidence—about the need for a writing—to prevail over CoraMed's recitation of the conduct evidencing a contract's existence.  *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 401–02 (1993) ("It is a settled principle of contract construction, however, that when the intent of parties to be bound by an agreement must be determined by disputed evidence or inferences outside the written words of the instrument a question of fact is presented." (quotations and alterations omitted)).  And that is because "partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect."  *R.G. Grp., Inc.*, 751 F.2d at 75–76.  "Partial performance by one party and the acceptance of such performance by another can satisfy" the requirement that there be an agreement.  *Kimm v. Kyu Sung Cho*, 706 F. App'x 1, 2 (2d Cir. 2017).  And it may do so, notwithstanding the absence of a written, executed contract.  *See Bed Bath & Beyond Inc. v. IBEX Constr., LLC*, 52 A.D.3d 413, 414 (1st Dep't 2008) ("[T]he record demonstrates that by moving forward with the project even in the absence of the fully executed construction agreement, IBEX manifested its intent to be bound by the [letter of intent]."); *T. Moriarty & Son v. Case Contracting Ltd.*, 287 A.D.2d 390, 390 (1st Dep't 2001) ("Plaintiff's partial performance of the agreed upon work, accepted by defendant Case without objection, as well as written confirmation of the subject subcontract objectively manifest the parties' intent to be contractually bound[.]").

Here, the Complaint alleges that from August 2019 through January 2020—*i.e.*, for six months—CoraMed implemented and managed Alexion's "Comparator Sales Channel" and screened requests to purchase Soliris for Comparator Use. (Compl. ¶ 71). It also provided "grey market product security risk analyses" and analyzed "the impact of proposed legislation on Alexion's business and Comparator Sales." (*Id.* ¶ 70). Its work resulted in the elimination of an impending lawsuit by a competitor. (*Id.* ¶ 88). And Alexion, in turn, facilitated that performance by providing CoraMed with 18 "months' worth of backlogged purchase demands" and putting it in touch with prospective purchasers. (*Id.* ¶ 60). That is, Alexion performed some of its obligations contemplated under the contract. Even if some additional terms needed to be hashed out, such *bilateral* partial performance reflects at least some kind of agreement or mutual understanding amongst the parties.[6] And in the face of such conduct,[7] "it cannot

---

[6] Alexion separately argues that the parties had not yet agreed on "numerous key terms, including, most crucially, the price at which Alexion would sell Soliris to [CoraMed]," thereby preventing contract formation. (Def. Reply at 4). "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). "Price or compensation are material terms in a contract requiring definiteness." *Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005). The Complaint alleges, however, that the parties agreed on a price. (Compl. ¶ 53). And to the extent Alexion believes documents outside the Complaint contradict this allegation, or that other material terms were never settled, such arguments are more properly raised at summary judgment.

[7] In reply, Alexion attempts to downplay CoraMed's performance, minimizing its significance. The argument—which is an attempt to weigh the evidence—is improper at the motion to dismiss stage. Nor can it be reasonably argued that CoraMed merely "prepared to perform its role." (Def. Reply at 11 (emphasis omitted) (citing *Rappaport v. Buske*, 98-CV-5255, 2000 WL 1224828, at *7 (S.D.N.Y. Aug. 29, 2000))). Here, the Complaint plainly alleges that CoraMed's performance from August through September 2019 "resulted in the elimination of the then-impending and threatened lawsuit" by a competitor. (Compl. ¶ 88). It also alleges that CoraMed screened, secured, and received

be said, on a pre-answer motion to dismiss, that [Alexion] gave forthright, reasonable

signals that it intended only to be bound by a written agreement signed by both parties.

Rather, [Alexion's] words and deeds raise an issue of fact as to its intent, preventing

dismissal of the complaint at this stage." *PMJ Cap. Corp. v. PAF Cap., LLC*, 98 A.D.3d

429, 431 (1st Dep't 2012).  The motion to dismiss the breach of contract claim is denied.[8]

---

approval for a certain sum of purchase requests.  (*Id.* ¶¶ 60, 64–65).  Alexion's reference
to *Southwick Clothing LLC v. GFT (USA) Corp.* is similarly unpersuasive.  (Def. Reply at
11).  In *Southwick*, the court dismissed the breach of contract claim, despite
"considerable partial performance," given "the existence of an explicit intent not to be
bound."  No. 99-CV-10452, 2004 WL 2914093, at *9 (S.D.N.Y. Dec. 15, 2004).  As noted
*supra*, here the parties did not expressly reserve the right not to be bound absent a
writing.

[8] The parties also discuss a four-factor test to determine whether a preliminary
agreement is enforceable as to the "ultimate contractual objective" (a "Type I"
agreement), or merely an "agreement to agree" and continue negotiating in good faith (a
"Type II" agreement).  The factors relevant to a Type I agreement are:

(1) whether there is an expressed reservation of the right not to be bound in the
absence of a writing;
(2) whether there has been partial performance of the contract;
(3) whether all of the terms of the alleged contract have been agreed upon; and
(4) whether the agreement at issue is the type of contract that is usually
committed to writing.

*Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).  But as the parties indicate, the New
York Court of Appeals has cast doubt on the applicability of this framework, deeming
these "rigid classifications" unhelpful.  *IDT Corp. v. Tyco Grp., S.A.R.L.*, 13 N.Y.3d 209,
213 n.2 (2009); *accord Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70
A.D.3d 423, 427 (1st Dep't 2010).  It urges courts to conduct a more functional inquiry,
evaluating whether the preliminary agreement "contemplated the negotiation of later
agreements and if the consummation of those agreements was a precondition to a
party's performance."  *IDT Corp.*, 13 N.Y.3d at 213 n.2; *see also White Winston Select
Asset Funds, LLC v. Intercloud Sys., Inc.*, 619 F. App'x 157, 161 (3d Cir. 2015) ("Since we
are bound to follow New York state law, we will not follow the taxonomy.  Rather, as
required by New York law, we will consider whether the agreement contemplates
negotiating later agreements and whether such agreements are a precondition to a
party's performance.").  In any event, the Court concludes that applying these factors
would not yield a different result, in light of CoraMed's partial performance.  *E.g.*,
*Barshay v. Naithani*, No. 20-CV-8579, 2022 WL 170599, at *6–*7 (S.D.N.Y. Jan. 18,

II.    <u>Breach of Implied Covenant of Good Faith & Fair Dealing</u>

The covenant of good faith and fair dealing, implicit in every contract, is a promise that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022) (quotations omitted). As a general matter, "a defendant violates the implied covenant when it purposefully sabotages a plaintiff's ability to benefit under the contract." *Thompson v. Advanced Armament Corp.*, 614 F. App'x 523, 525 (2d Cir. 2015). "To state a viable claim of a breach of the duty of good faith and fair dealing, the plaintiff must allege not that the contract's express terms were violated but that its purpose was subverted, depriving him of his reasonable expectations." *ProSource Techs., LLC v. Certain Underwriters at Lloyd's London*, No. 17-CV-629, 2018 WL 8729451, at *9 (N.D.N.Y. Aug. 10, 2018) (quotations omitted).

Alexion contends the claim is duplicative of CoraMed's breach of contract claim and therefore should be dismissed. This argument has no merit. Claims for breach of contract and breach of the implied covenant of good faith and fair dealing are "duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861,

---

2022) (holding that "Plaintiff has alleged adequately that the parties intended to be bound by the Oral Agreement," in large part because the "Amended Complaint clearly alleges partial performance of the contract"); *In re NAP, Inc.*, No. 96-CV-640, 1996 WL 221623, at *4–*5 (S.D.N.Y. May 1, 1996) (finding that the "part performance factor strongly" indicates a binding contract, where both parties "performed extensively" and for a period of eight months), *aff'd sub nom. NAP, Inc. v. FRAJAC*, 104 F.3d 350, 1996 WL 537914, at *3 (2d Cir. 1996) (table).

869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc.*, 70 A.D.3d at 426); *see also JN Contemp. Art LLC*, 29 F.4th at 128 ("A claim for violation of the covenant survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract."). But "a claim for breach of the implied covenant of good faith and fair dealing is not duplicative when the claim depends on facts in addition to those that might support a breach of contract claim." *Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26, 35 (S.D.N.Y. 2021) (quotations omitted).

CoraMed's breach of contract and breach of good faith claims are predicated, at least in part, on different facts and also seek different damages. The breach of contract claim alleges Alexion interfered with its "ability to collect a markup on comparator sales *for which it provided services*." (Compl. ¶ 94 (emphasis added)). That is, the breach stems from Alexion's act of "dealing directly" with (and collecting payment from) three third-party sponsors, with whom CoraMed had *already* brokered sales transactions. For this breach, CoraMed seeks a sum certain—$31,789,158—*i.e.*, its share of the revenue for these three approved purchase orders, reflecting the markup price passed on to the purchasers. (*Id.* ¶ 96; *id.* Prayer for Relief (a)). On the other hand, its good faith claim is based, in part, on Alexion's conduct in frustrating the agreement, which imperiled "CoraMed's ability to earn fees in connection with future comparator sales," (*id.* ¶ 102), and damaged CoraMed's "standing"—and its business generally—in the marketplace. (*Id.* ¶ 103). It seeks compensatory damages for those additional damages. (*Id.* ¶ 104; *id.* Prayer for Relief (b)). In other words, the breach of contract claim seeks compensatory damages for services already performed under the agreements, whereas

the good faith claim seeks damages for profits that were not realized because of the effects of Alexion's actions to undermine the agreement, including by dealing directly with sponsors, and by terminating the agreement "without warning or prior notification" on the "pretext" that an Alexion employee held an ownership interest in CoraMed—despite the fact that such interest was known and approved by senior Alexion employees prior to formation of its business relationship with CoraMed.  (Compl. ¶¶ 76, 80–81, 100, 102).  CoraMed alleges Alexion engaged in such conduct to intentionally "delay the fulfillment of future requests to purchase Soliris for Comparator Use."  (*Id.* ¶ 79).  "[W]here a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties," the breach of fair dealing claim survives. *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 722 F. App'x 12, 16 (2d Cir. 2018) (quotations omitted); *Butvin v. DoubleClick, Inc.*, No. 99-CV-4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001) ("New York courts have recognized a separate cause of action for breach of the covenant of good faith and fair dealing . . . in cases involving efforts by one party to a contract to subvert the contract itself.") (collecting cases), *aff'd*, 22 F. App'x 57, 58 (2d Cir. 2001); *cf, e.g.*, *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) ("Plaintiffs have plausibly alleged that AP deprived Plaintiffs of 'the fruits of' the contributor agreements[.]"); *Harleysville Worcester Ins. Co. v. Consigli & Assocs., LLC*, No. 21-CV-934, 2023 WL 4684652, at *7 (S.D.N.Y. July 21, 2023) ("Accepting as true all allegations, such conduct could have had the effect of destroying

or injuring the right of [Consigli] to receive the fruits of the contract." (quotations and citation omitted)).[9]

Alexion also argues that the section laying out CoraMed's good faith claim contains some allegations that are "nearly identical" to those in the breach of contract section—for example, the allegation that it "inappropriately cut [CoraMed] out of its dealings." (Def. Mem. at 18). Indeed, some of the allegations are factually similar. (*Compare* Compl. ¶ 93 (alleging in the breach of contract section that Alexion "breached its covenants . . . by circumventing CoraMed and dealing directly with purchasers"), *with id.* ¶ 100 (alleging in the good faith section that "Alexion surreptitiously cut CoraMed out of the deal and dealt directly with the purchasers")). But despite the overlap, the good faith claim depends on additional factual allegations of wrongful conduct, such that the two claims are not entirely duplicative. *See, e.g.*, *JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., Inc.*, 46 Misc.3d 755, 777 (Sup. Ct. 2014) ("While some of the damages alleged in the claim for breach of the covenant of good faith and fair dealing may be 'intrinsically tied' to the damages resulting from the breach of contract claim, [plaintiff] alleges additional purportedly wrongful conduct during the parties' negotiation process that was not alleged as wrongful conduct constituting a breach of contract. Therefore, while [plaintiff's] ninth cause of action and its breach of contract claims involve some overlap, they consist of distinct, non-duplicative

---

[9] Alexion contends CoraMed is attempting to "re-write" the Complaint in its brief. (Def. Reply at 14). Not so. The Court can reasonably infer, by reading the factual allegations together, that CoraMed's loss of profit from future Comparator Sales is the result of Alexion's termination of the agreement, allegedly on the bad-faith pretext that an Alexion employee's ownership interest in CoraMed created a conflict of interest. (*See* Compl. ¶¶ 76–77, 80–83, 102; *id.* ¶ 79 ("Alexion intended to delay the fulfillment of future requests to purchase Soliris for Comparator Use by terminating the CoraMed Agreement.")).

independent claims."). And "even if [CoraMed's] claims prove to be duplicative, resolution of the issue at this preliminary stage would be premature because the full facts underlying the instant claim [are] not developed." *ProSource Techs., LLC*, 2018 WL 8729451, at *9 (quotations and alteration omitted). The motion to dismiss Count II is denied.

III.   <u>Tortious Interference with Contract</u>

To state a claim for tortious interference with contract under New York law, a plaintiff must plead "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quotations omitted). "One asserting a tortious interference claim must also show that the defendant was not a party to the contract with which he allegedly interfered." *TVT Recs. v. Island Def Jam Music Grp.*, 412 F.3d 82, 88 (2d Cir. 2005); *see also Bradbury v. Israel*, 204 A.D.3d 563, 564 (1st Dep't 2022) ("[O]nly a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." (quotations omitted)).

CoraMed alleges Alexion tortiously interfered with its contracts with third parties—namely the sponsors of three clinical trials—by causing them to deal directly with Alexion instead of through CoraMed. (Compl. ¶¶ 122–26). Alexion maintains that it was not a "stranger" to CoraMed's purported contracts for the sale of Soliris to clinical trial sponsors—and therefore cannot be liable for tortiously interfering with the contracts—since it would have been a "necessary party" to those sales transactions. (Def. Mem. at 19). Specifically, it argues that because it retained control over, and was

directly involved in, the selection and approval process for the sale of Soliris, it was not a stranger to CoraMed's contracts with sponsors.  (*Id.* at 20).

Alexion misapplies the "stranger" doctrine.  To be sure, "[d]efendants cannot, as a matter of law, have tortiously interfered with their own contract."  *Cortes v. Twenty-First Century Fox Am., Inc.*, 285 F. Supp. 3d 629, 640 (S.D.N.Y. 2018) (quotations omitted), *aff'd*, 751 F. App'x 69, 74 (2d Cir. 2018).  The rationale is that the "plaintiff ha[s] an adequate remedy for breach of contract [since the] defendant [is] alleged to have breached its own duties to [the] plaintiff under the contract."  *Arena Invs., L.P. v. DCK Worldwide Holdings, Inc.*, 215 A.D.3d 155, 158 (1st Dep't 2023).  But here, the Complaint alleges the existence of two distinct sets of contracts: *first*, the contract arising from Alexion's sale of Soliris to CoraMed; and *second*, the various contracts surrounding CoraMed's sale of Soliris to sponsors of clinical trials.  In other words, as CoraMed asserts, the contracts cover two separate, discrete links in the supply chain.  And in the contracts between CoraMed and sponsors, Alexion is not a party but merely an upstream supplier.  Alexion's duties arise under its contract with CoraMed, and not those with the sponsors.  And while Alexion's participation may have been necessary to CoraMed's ability to fulfill its obligations under the agreements with sponsors, Alexion was not a party to those contracts.  *Cf. ESI, Inc. v. Coastal Power Prod. Co.*, 13 F. Supp. 2d 495, 500 (S.D.N.Y. 1998) ("La Casa Castro argues that, as a matter of law, it could not have tortiously interfered with the DELASA-ESI Assignment because it was a party to that contract. . . .  [T]he Three-Party Agreement required that La Casa Castro consent to any assignment of DELASA's ownership interest. . . .  This argument is without merit.  La Casa Castro's consent was merely a condition precedent to the valid formation of DELASA-ESI Assignment.  Once La Casa Castro consented and the contract was formed,

La Casa Castro had no rights or obligations under the contract.").[10]  The motion to dismiss this claim is denied.

IV.   Tortious Interference with Prospective Economic Advantage

"Under New York law, in order to make out a *prima facie* case for tortious interference with prospective economic advantage, a plaintiff must establish '(1) that [he] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 59–60 (2d Cir. 2009) (quoting *Kirch*, 449 F.3d at 400).

"'[A]s a general rule, a defendant's conduct must amount to a crime or an independent tort' in order to amount to tortious interference with a prospective economic advantage." *Id.* at 60 (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)).  "A defendant who has not committed a crime or independent tort or acted solely out of malice may nevertheless be liable if he has employed 'wrongful means,'" including "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and extreme and unfair economic pressure."  *Id.* (quotations omitted).

---

[10] In the alternative, Alexion argues that the draft MSA, draft Supply Agreement, and CoraMed's contracts with sponsors should be construed as one agreement, because Alexion would be a party to that multilateral agreement.  As an initial matter, it is not clear that the Court can consider either the MSA or Supply Agreement, *see supra*.  But in addition, "whether multiple writings should be construed as one agreement depends upon the intent of the parties, an issue which is typically a question of fact for the jury." *TVT Recs.*, 412 F.3d at 89 (quotations and alteration omitted).  Only "if the documents in question reflect no ambiguity as to whether they should be read as a single contract [is] the question . . . a matter of law for the court."  *Id.*  Here, both the draft MSA and draft Supply Agreement were, as their names suggest, unexecuted "drafts" and do not unequivocally demonstrate the parties intended the writings to be part of a single overarching contract.

CoraMed argues it has alleged classic attempted monopolization and monopoly maintenance violations of the Sherman Act, 15 U.S.C. § 2, which can serve as the underlying wrongful conduct for the tortious interference claim.  (Pl.'s Opp'n to Mot. to Dismiss, Dkt. No. 30 at 37).  While Federal Rule of Civil Procedure 8 "does not demand that a complaint be a model of clarity or exhaustively present the facts alleged, it requires, at a minimum, that a complaint give each defendant 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'"  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (quoting *Ferro v. Ry. Express Agency, Inc.*, 296 F.2d 847, 851 (2d Cir. 1961)).  But here, the Complaint makes no mention of the Sherman Act or its requirements, and therefore, it does not allege any facts demonstrating Alexion violated the Act.  The Complaint merely alleges "Alexion terminated CoraMed because Alexion wished to maintain its monopoly position."  (Compl. ¶ 77).  But not all monopolies are *per se* unlawful under the Sherman Act.  This is insufficient to satisfy the third element of the claim.  *Carvel Corp.*, 3 N.Y.3d at 190 ("Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations."); *Godinger Silver Art Ltd. v. Hirschkorn*, 433 F. Supp. 3d 417, 427 (E.D.N.Y. 2019) (dismissing claim for tortious interference with prospective business relations where "conclusory statements [in the amended complaint] offer[ed] no facts to plausibly support plaintiffs' claim that Hirschkorn acted with any improper motive or means").

CoraMed alternatively argues Alexion committed an independent tort—defamation.  Only one allegation in the Complaint pertains to a defamation claim: "Alexion . . . defamed CoraMed to [various sponsors] for the purpose of harming CoraMed's business relationships with [them]."  (Compl. ¶ 136).  There are no details

about the allegedly false statement, knowledge of its falsity, communication of the statement, or damages arising therefrom.  This conclusory allegation of "defamation" is therefore a legal label, without necessary factual support, and cannot support a prospective economic advantage claim.  *E.g.*, *Glob. Packaging Servs., LLC v. Glob. Printing & Packaging*, 248 F. Supp. 3d 487, 495 (S.D.N.Y. 2017) (dismissing claim for tortious interference with prospective business advantage for failure to adequately allege "wrongful means," noting that the court, "even on a motion to dismiss, is not required to accept conclusory allegations—particularly allegations . . . characterizing or attributing a state of mind of another person"); *Holliswood Owners Corp. v. Rivera*, 145 A.D.3d 968, 970 (2d Dep't 2016) (affirming dismissal of tortious interference with prospective business relationships because "plaintiffs failed to plead an independent tort of defamation"); *Exec. Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 373 (N.D.N.Y. 2021) ("The only conduct alleged in the amended complaint relevant to this claim that is aimed at a third party is the alleged defamatory statements Defendant Gross made about Plaintiff's financial stability. . . .  [T]he Court has already found that the amended complaint fails to plausibly state a defamation claim.  Therefore, this conduct cannot be the 'independent tort' upon which Plaintiff bases [its] claim [for tortious interference with prospective economic relations].").[11]

CoraMed's generic allegation that Alexion "acted for the sole purpose of harming CoraMed," (Compl. ¶ 137), also does not save this claim.  "[W]here the offending party's

---

[11] CoraMed also contends New York's *prima facie* tort can serve as the basis for this claim.  "The four elements for a prima facie tort in New York State are: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful."  *Katz v. Travelers*, 241 F. Supp. 3d 397, 405 (E.D.N.Y. 2017).  Like with defamation, CoraMed fails to allege any facts that Alexion's conduct meets these elements.

actions are motivated by economic self-interest, they cannot be characterized as solely malicious." *L. Offs. of Ira H. Leibowitz v. Landmark Ventures, Inc.*, 131 A.D.3d 583, 586 (2d Dep't 2015); *accord 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (noting that "[w]hen a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate'" (quoting *Carvel Corp.*, 3 N.Y.3d at 190)). Having not differentiated economic self-interest of Alexion from illegal conduct—other than in generic, conclusory terms—this claim must be dismissed. *See, e.g.*, *Gross*, 525 F. Supp. 3d at 374 (dismissing claim for tortious interference with prospective business relations, in part, because allegation that "Defendant Gross wanted to divert Plaintiff's business opportunities for himself," represented "normal economic self-interest" that is "insufficient to satisfy the wrongful means element").

<u>CONCLUSION</u>

For the reasons stated above, the motion to dismiss is denied with respect to CoraMed's claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and tortious interference with contract (Count V). The motion is granted as to CoraMed's claim for tortious interference with prospective economic advantage (Count VI). CoraMed may file an Amended Complaint that attempts to correct the deficiencies identified in Count VI no later than **October 27, 2023**. Any Amended Complaint should only provide additional allegations related to

this and no other claim.  The parties are directed to file a joint proposed schedule for the completion of any outstanding discovery by **October 4, 2023**.


     SO ORDERED.

     */s/ Sanket J. Bulsara*
     SANKET J. BULSARA
     United States Magistrate Judge

Brooklyn, New York
September 27, 2023